UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARVIN LOPEZ, et al., | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 16-cv-11877-LTS |
| CITY OF SOMERVILLE, et al., | ) | |
| Defendants. | ) | |

ORDER ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
June 21, 2018

SOROKIN, J.

On July 22, 2016, plaintiffs Marvin Lopez ("Lopez"), Cecilia Lopez, and Marvin Lopez, Sr., filed a complaint in state court against the City of Somerville and various individuals (collectively "Somerville"),[1] alleging, among other claims, sex discrimination, negligence, and loss of consortium, arising from Lopez's sexual assault at a sports camp in 2013 and the aftermath of that incident. Doc. Nos. 1-1; 21. Somerville removed the suit to this Court, Doc. No. 1,[2] and now moves for summary judgment on all claims against them, Doc. No. 36.

---

[1] The individuals are George Scarpelli, the head coach of Somerville High School's varsity soccer team for boys; Joseph Curatone, the assistant coach of Somerville High School's football team and Mayor of Somerville, Massachusetts; and Anthony Pierantozzi, the Superintendent of Somerville Public Schools (collectively the "Individual Defendants"). Doc. Nos. 42 at ¶¶ 5-7; 43-D at ¶¶ 2, 12.
[2] The Lopezes subsequently amended their complaint on two occasions. See Doc. Nos. 18; 21. Hereinafter, all references to "the Complaint" refer to the Second Amended Complaint. See Doc. 21.

1

The Lopezes oppose Somerville's motion with respect to Counts I-VII but not Counts VIII-XII. Doc. No. 42 at 1. Accordingly, the Court ALLOWS Somerville's motion for summary judgment as to Counts VIII-XII as UNOPPOSED. That leaves for resolution Somerville's motion on Counts I-VII.

I. BACKGROUND

The facts, based upon the undisputed facts before the Court, the Lopezes' factual submissions even where disputed, and those facts established by drawing all reasonable inferences in the Lopezes' favor, are set forth below.

In August 2013, Lopez began his freshman year at Somerville High School. Doc. No. 43-P at ¶ 3.[3] From August 23-26, 2013, he attended an overnight, off-campus athletics camp ("the camp"), which was a prerequisite to participate in Somerville High School's soccer program. Id. at ¶ 5; Doc. No. 43-D at ¶ 1. Lopez attended the camp with the permission of his parents Cecilia Lopez and Marvin Lopez, Sr. Doc. No. 43-D at ¶ 1.

**A. Somerville High School's Anti-Hazing Policy**

Somerville High School has an anti-hazing policy. Id. at ¶ 77. The policy was in force in 2013 and was printed in the Somerville High School student handbook, which all student athletes are required to sign, indicating receipt and acknowledgement of the policy. Id. at ¶¶ 77-78.

Nevertheless, before arriving at camp, Lopez had heard stories about upperclassman campers "pulling the shower curtain open when someone was showering or kicking the door

---

[3] Somerville's statement of facts and the Lopezes' responses are set forth in Section I of the Plaintiffs' Response to Defendants' Statement of Material Facts at paragraphs numbered 1 through 98, see Doc. No. 43 at 1-41; the Lopezes' statement of additional facts are set forth in section II of the document at paragraphs numbered 1 through 92, see id. at 41-50. To avoid confusion resulting from the overlapping paragraph numbers, Citations to 43-P are to the Lopezes' additional statement of facts, i.e. part II of Docket Number 43; citations to 43-D are to Somerville's statement of facts, i.e. part I of Docket Number 43.

2

open when someone was using the bathroom" and had heard to "keep[] the door locked because of pranks." Id. at ¶¶ 18-19. According to one camper, in previous years at the camp, "if a person was showering, other guys would . . . get in the shower and . . . spank him" and that "there was putting Icy Hot [cream] on other players' genitals." Pl. Ex. No. 15 at 17. Additionally, in 2012, one student reported to the soccer coaches that freshman campers were running into freshman showers while other freshman were showering. Doc. No. 43-D at ¶ 98.

Before the August 2013 session of the camp, Joseph Curatone, the mayor of Somerville and an assistant coach of Somerville High School's football team, spoke to the Somerville High School athletes. Id. at ¶ 2. He warned the athletes that hazing would not be tolerated at the soccer camp. Id.

### B. The 2013 Camp

Once Lopez arrived at the camp, he was assigned to a freshman cabin. Id. at ¶ 3. The coaches' cabin was adjacent to Lopez's cabin, and he and the other campers were instructed to come to the coaches' cabin if they needed anything. Id. at ¶¶ 8-9. At least five soccer coaches from Somerville High School attended the camp with the Somerville High School student athletes. Id. at ¶ 12. They did not chaperone the campers while the campers were in their cabins, id. at ¶ 15, and, on several nights, drank beer outside in front of the coaches cabin. Id. at ¶ 26.

Between August 23 and August 24, 2013, several incidents of hazing occurred at the camp, including "putting Icy Hot on genitals." Doc. No. 43-P at ¶ 27.

### C. The Assault in the Cabin

On Sunday August 25, 2013, some of the students and coaches, including Head Soccer Coach George Scarpelli, left the campsite for an off-site varsity scrimmage game. Doc. No. 43-D

at ¶¶ 34, 37-38. About thirty students remained at the camp, and two coaches stayed behind with them. Id. at ¶¶ 38-39; Doc. No. 43-P at ¶ 28.[4] That morning, after breakfast, the students remaining at the campsite took a mid-morning break, and Lopez and his freshman cabin-mates returned to their cabin. Doc. No. 43-D at ¶ 40. At this time, three upperclassmen entered the freshman cabin, yelling "freshman beat down." Id. at ¶ 41. Lopez went to the bathroom, while one of the upperclassman "touch[ed] [a second freshman] underneath his shorts." Id. at ¶ 44. When Lopez came out of the bathroom, an upperclassman grabbed him and "set him in the middle of the cabin facing the door and forc[ed] him to choose either getting a broomstick in his butt right now or later get[ing] [Icy Hot cream] rubbed over his genitals." Id. at ¶ 45. Lopez said "he did not want either." Id. at ¶ 46. One of the upperclassmen then told Lopez that he had received "Icy Hot last year and that it burned for the rest of the night and the next day." Id. Lopez continued to resist, but ultimately bent down and pulled down his shorts. Id. at ¶ 47. Then, one or more of the upperclassman thrust a broom up Lopez's anus, causing Lopez to bleed. Id. Hurt, Lopez ran to the bathroom. Id. One of the upperclassmen then offered to bring Lopez ice, and one or more warned Lopez not to tell anyone about the incident. Id. at ¶ 49. The upperclassmen then left the cabin and did not return with ice. Id. at ¶ 48.

---

[4] In paragraph 38 of Somerville's statement of material facts, Somerville asserts that "[Two coaches] remained behind with those [students] not selected to attend the varsity scrimmage." Doc. No. 43-D at ¶ 38. In response, the Lopezes claim "a genuine issue of material fact to be tried relative to the statement contained in [paragraph 38]" and that the students "had been left at the camp with one chaperone." Id. (emphasis added). That two coaches, Coach Santos and Coach Tsirigotis, remained behind at the camp is not a disputed fact; the Lopezes' citations in their response to paragraph 38 support this fact. See Pl. Ex. No. 16 at 56-57 ("Me [Coach Tsirigotis], Coach Santos [are] the only people I know for sure that I can remember [were left at the camp with the kids]"); Pl Ex. No. 18 at 46 ("two coaches"). The Lopezes' response that there was only "one chaperone" with the remaining students is supported by the testimony of Coach Santos in his deposition that his job was to "just coach"—not chaperone. Pl. Ex. No. 18 at 89.

**D. The Remainder of Camp**

After the assault, Lopez sat on the toilet, bleeding. Id. at ¶ 51. He asked another camper to take a photo[5] so that he could see how bad his injury was. Id. Lopez was "shocked" by the blood, and lay on his bed for a time to ease the pain. Id.; Pl. Ex. No. 1 at 44. He then "went about [his] day" and participated in scheduled soccer practice without incident. Pl. Ex. No. 1 at 44; Doc. No. 43-D at ¶ 51.

By lunchtime, all campers and coaches had returned to the campsite. Doc. No. 43-D at ¶ 53. That night, the campers and coaches participated in a team bonfire. Id. at ¶ 54. At the bonfire, Coach Scarpelli asked the freshman to share what the camp meant to them. Id. at ¶ 56. When it was Lopez's turn to share, he said, "pain." Id. One of the upperclassman asked Lopez "good pain or bad pain?" Id. To which, Lopez responded "bad pain." Id. The upperclassman then said, "if it was bad pain, why did you ask for it twice?" Id. Coach Scarpelli heard this exchange but did not follow up. Id.

**E. The Aftermath**

Once Lopez was home, Cecilia Lopez, his mother, noticed that he was sad and quiet, but Lopez did not say anything to her about what had happened to him at camp. Id. at 52; Pl. Ex. No. 7 at 12. He then "went to his bedroom to rest" and "laid down and he didn't get up." Pl. Ex. No. 7 at 12.

On August 27, 2013, the Tuesday following camp, the soccer team held practice with all of the players. Doc. No. 43-P at ¶ 54. Lopez did not attend. Id. That same day, a parent of a camp attendee reported Lopez's assault to one of the assistant soccer coaches. Id. at ¶ 55. When Coach Scarpelli learned that a parent knew about the assault, he said, "We're so fucked." Id. at ¶ 56.

---

[5] The photograph has not been submitted to the Court as part of the Summary Judgment record.

Coach Scarpelli then reported the incident to Somerville High School's Athletic Director, who relayed the information to Somerville's Headmaster, who then notified the Superintendent. Doc. No. 43-D at ¶ 85. Somerville High School then started to gather some facts as to what may have happened" and, that day, filed a 51A form, reporting the incident to the Commonwealth's Department of Children and Families. Id. at ¶ 86; Def. Ex. No. 2 at 47-48.

On the afternoon of August 27, 2013, Lopez met up with his friends. Doc. No. 43-D at ¶ 61. On his way to meet them, Lopez received a text message from one of his friends saying, "[T]he coaches know of what happened at camp." Id. at ¶ 61. Once the friends were together, they talked about what happened at camp, that the coaches knew, and what they should do. Id. at ¶ 62. Lopez and his friend James agreed to be truthful about what happened at camp if the coaches asked them. Id. at ¶ 62.

That same day, Somerville High School reported the incident to the police. Doc. No. 43-D at ¶ 86; Def. Ex. No. 2 at 48. At that point, the school was "instruct[ed] that it was a police matter" and that school officials should not speak to "[a]ny potential witnesses or victims" so as "not to interfere with the police investigation." Def. Ex. No. 2 at 48. At this instruction, after August 27, 2013, the school conducted no further investigation of the assault but rather relied on communications from the school's attorney for information about the ongoing police investigation. Id.

That night, a police detective and one of the soccer coaches came to the Lopez's home and informed Cecilia Lopez and Marvin Lopez, Sr., about what had happened to their son at camp. Id. at ¶ 66. At the advice of the police detective, the Lopezes went to the emergency room that night for Lopez to be examined by a doctor. Id. at ¶ 67. The next day, Somerville High School held a meeting in the school library for athletes that had attended the camp and their

6

parents, which Lopez and his parents attended. Id. at ¶ 68. At the meeting, Coach Scarpelli spoke. Id. at ¶ 70. He informed the students and parents that an incident had occurred at the camp, that it was being taken seriously, that there would be an investigation, and that the incident would "not go unpunished." Id.; Pl. Ex. No. 1 at 61. After the general meeting, Coach Scarpelli met with the Lopezes privately with a Spanish translator. Pl. Ex. No. 1 at 63-64. He cried and told the Lopezes "I imagine your pain and I'll do my very best to see what I can do to get to the bottom of this. I'm truly sorry." Id.

On either August 27 or August 28 of 2013, the three upperclassmen involved in the assault of Lopez were suspended from Somerville High School. Def. Ex. No. 3 at 18. On Friday, August 30, 2013, the three upperclassman were arrested and charged with crimes. Doc. No. 43-D at ¶ 74.

### F. Subsequent Steps

Following the assault of Lopez, the City enlisted Somerville's trauma response network, "which includes mental health workers and other support people with the city" to support students and families impacted by the hazing that had occurred at the 2013 camp. Def. Ex. No. 2 at 55. They additionally enlisted the service of the Boston Area Rape Crisis Center, and provided students and families with pamphlets and fliers describing the support services available to them. Id. at 55-56. The City also changed the school's code of conduct and held an assembly for the entire student body of Somerville High School to discuss the continuing effects that the assault and hazing at camp might have on the community. Doc. No. 43-D at ¶ 94. Somerville High School personnel also conducted routine check-ins on Lopez for the duration of his tenure at the school, and Lopez was offered an escort to accompany him between classes, which he declined.

Def. Ex. No. 2 at 57-58, 68.[6] Additionally, Somerville High School employed extra personnel for its home games to ensure vigilance in the wake of the assault. Def. Ex. No. 2 at 63. The school did not employ extra personnel for its away games but alerted the athletic directors of rival schools to be on guard for incidents of hazing and taunting. Id.; Pl. Ex. No. 3 at 61.

The City did not specifically communicate with the Lopez family about the services available to them. Doc. No. 43 at ¶ 90; Pl. Ex. No. 22 ("[Cecilia Lopez] is . . . disappointed with the school because they have not offered her any help and they have not reached out to her family."). Although Somerville High School typically creates a written safety plan for students who are victims of harassment or bullying, the School Head Master could not recall whether such a plan was written for Lopez nor could the School Athletic Director recall receiving such a plan. Pl. Ex. Nos. 2 at 58-59; 3 at 63.

Lopez was taunted and bullied for the remainder of his high school career—both on the soccer field and in the hallways at school. Doc. No. 4-D at ¶ 95; Doc. No. 43-P at ¶¶ 82-84. He was called names, including "broom stick," "broom boy," and "shish kebob boy." Doc. No. 43-P at ¶¶ 83-84. This taunting occurred at home and away games. Pl. Ex. No. 3 at 53. Coach Scarpelli and other staff were aware of the bullying and taunting of Lopez and reported it to the Somerville's Athletic Director. Pl. Ex. No. 3 at 53-54. The Athletic Director, in turn, reported it

---

[6] The Lopezes state whether these routine check-ins were conducted is a disputed fact, citing Lopezes' deposition. See Doc. No. 43-D at ¶ 93. In Lopezes' deposition, he, when asked if the "[soccer] coaches [were] helpful to [him]," answered affirmatively, "In a way, yeah, because they said 'if you ever need anything, ever need to talk, you know I'm here. Just come and . . . we'll talk." Then, when asked "Who said that?" Lopez responded, "Coach Scarpelli" and, when asked "anybody else?," Lopez said "No [not anybody else.]" Pl. Ex. No. 1 at 76. Lopez's testimony that no one other than Coach Scarpelli said to him "if you ever need anything, ever need to talk, you know I'm here. Just come and . . . we'll talk" is not, evidence that the school did not check-in on Lopez. It is evidence that Coach Scarpello was the only soccer coach who offered to talk with Lopez in the event that he "ever need[ed] to talk."

8

to the Massachusetts Interscholastic Athletic Association ("the MIAA"), which then provided additional staff at playoff games. Id. at 56. The Athletic Director did not formally follow up with Lopez about his experience during at-home or away games. Id. Neither did she report the continued taunting of Lopez to the Superintendent or the Headmaster. Id. at 57. When asked if she offered any emotional support to Lopez, she said, "I may have. Sorry . . . I may have, I may have, but very informally." Id. at 56, 63.

Lopez went to see a counselor on three or four occasions during the years following his assault, but he felt that it did not help him. Pl. Ex. No. 1 at 75-76. He played soccer for the duration of his high school career, which he found helpful because it "kept his mind off things." Id. at 76. He also found Coach Scarpelli helpful, who told Lopez that if "[he] ever need[ed] anything, ever need[ed] to talk . . . I'm here." Id.

II. THE LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute "is one on which the evidence would enable a reasonable jury to find the fact in favor of either party." Perez v. Lorraine Enters., Inc., 769 F.3d 23, 29 (1st Cir. 2014). "A 'material' fact is one that is relevant in the sense that it has the capacity to change the outcome of the jury's determination." Id. (citation omitted).

Once a party "has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). The Court is "obliged to view the record in the light most

favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008) (quoting Medina–Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)). A court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III. THE TITLE IX CLAIMS

The Lopezes allege violations of 20 U.S.C. § 1681 ("Title IX") against the City of Somerville (Count I) and the Individual Defendants (Counts II, III, IV).

Title IX actions may only be brought against an education institution or entity; there is no Title IX liability for individuals in their personal capacities. Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 901 (1st Cir. 1988). The Lopezes conceded this point at the hearing. Accordingly, the Court ALLOWS Somerville's Motion for Summary Judgement as to Counts II, III, and IV.

As to the City of Somerville ("the City"), the Lopezes contend the City is liable under Title IX because Lopez was subjected to a hostile environment by his peers and the City was deliberately indifferent. See Doc. No. 42 at 13-15.[7] The Lopezes presents two theories for

---

[7] The Lopezes do not argue in their brief that the City was responsible for the assault itself. See generally Doc. No. 42 at 8-15. They have therefore waived this argument. See Neelon v. Krueger, No. 12-CV-11198-IT, 2015 WL 4750842, at *2 (D. Mass. Aug. 11, 2015) (explaining that it is the parties' "burden to raise [] argument[s] and identify [] evidence[.]"). Nevertheless, because the Lopezes advanced this position at the hearing, the Court addresses it. The facts, construed in the Lopezes' favor, do not support an inference that "an official who . . . ha[d] authority to address the alleged discrimination and to institute corrective measures ha[d] actual knowledge of the [alleged] discrimination[,]" prior to the assault of Lopez, such that the City could be held liable for causing the assault. The evidence in the record from which an inference

10

establishing deliberate indifference: (1) the City violated Title IX procedures by not conducting its own independent investigation of Lopez's assault, see Doc. No. 42 at 13-14; and (2) the City responded inadequately to the continued harassment of Lopez, see id. at 15.

Title IX provides in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 280 (1998) (quoting 20 U.S.C. § 1681(a)).[8] "[S]exual

---

of actual knowledge may be drawn is (1) several campers testified about incidents of hazing occurring during the 2013 camp and previous camps; (2) the Mayor spoke about hazing prior to the 2013 camp and warned campers that such behavior would not be tolerated; and (3) during the 2012 camp, a camper reported to the coaches that some freshman campers were running into the showers while other freshman campers were showering. Doc. No. 43-D at ¶¶ 2, 17-18, 97-98. There is no evidence in the record of any reports of hazing to school personnel beyond the 2012 report that campers were running into one another's showers. See generally id. After the camper made the report, the coaches spoke to the campers involved and told them to stop. Id. at ¶ 98. The camper never again raised the issue to the coaches or any other City personnel. Id. Without more, these facts do not support an inference of actual knowledge of sexual harassment "sufficiently severe to interfere with the . . . school opportunities normally available to [a student]," as required for Title IX liability. Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999); see Doe v. D'Agostino, 367 F. Supp. 2d 157, 166–67 (D. Mass. 2005) (granting summary judgment because reports that a teacher "used 'inappropriate incentives,' was unable to maintain a 'professional distance,' and that [a student] frequently cried in class were insufficient" to put an institution on notice of sexual harassment "severe enough to compromise the victim's ... educational opportunities.").

[8] As a preliminary matter, Somerville argues that summary judgment should be granted in their favor because Lopez has not alleged sufficient facts from which a reasonable juror might infer that his assault and subsequent harassment were "because of sex." To be cognizable under Title IX, "[h]arassing conduct need not be motivated by sexual desire," Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998), but the harassment must be "on the basis of sex," Morgan v. Town of Lexington, MA, 823 F.3d 737, 745 (1st Cir. 2016) (quoting 20 U.S.C. § 1681(a)). Lopez has alleged that he was forcibly sodomized and subsequently called names such as "broom stick." Supra. These facts are sufficient to support an inference that Lopez was discriminated against because of sex. See Thomas v. Town of Chelmsford, No. 16-11689-PBS, 2017 WL 3159979, at *3 (D. Mass. July 25, 2017) (finding alleged harassing comments such as "Hey Broomstick! How is your asshole?", "You are so annoying you got a pole shoved up your ass. . .", and "[Plaintiff] went to camp a tight end and came back a wide receiver" sufficient to infer discrimination on the basis of sex when the comments followed plaintiff's sexual assault at football camp).

harassment can constitute sex discrimination." Wills v. Brown Univ., 184 F.3d 20, 25 (1st Cir. 1999). One type of sexual harassment that is cognizable under Title IX is a hostile environment. See id. An institution is liable under Title IX for a hostile environment, when a victim is "[1] subjected to [sex-based] harassment severe enough to compromise the victim's . . . educational opportunities," of which [2] the institution "had actual knowledge" yet [3] "exhibited deliberate indifference to it." Id. at 26.

For the purposes of Title IX, an institution has actual knowledge if "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of the discrimination in the [institution]'s programs." Gebser, 524 U.S. 274 at 290. Deliberate indifference may be established if the institution's, "response to the harassment or lack [of response] is clearly unreasonable in light of the known circumstances." Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 648 (1999). "If the institution takes timely and reasonable measures to end the harassment, it is not liable under Title IX for prior harassment." Wills, 184 F.3d at 26. Furthermore, for Title IX liability to attach "the deliberate indifference must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." Davis, 526 U.S. at 645 (citation omitted).

First, the City's failure to conduct its own investigation of Lopez's assault does not amount to deliberate indifference.[9] On the day the assault was reported to City personnel, the

---

[9] "The Department of Education [the Department] . . . has published guidance for schools regarding the actions schools should take in response to allegations of sexual harassment[.]" Doe v. Univ. of Massachusetts-Amherst, No. CV 14-30143-MGM, 2015 WL 4306521, at *7 (D. Mass. July 14, 2015) (citing Russlyn Ali, Dear Colleague Letter, U.S. Dept. of Educ. at 1 (Apr. 4, 2011)). To the extent the City failed to follow the Department's guidance, see Doc. No. 42 at 13-14, this failure does not, on its own, make the city liable under Title IX; Lopez must still establish deliberate indifference. See id. (noting Title IX liability may attach to a University that

12

City reported it to the Department of Children and Families and to the State police. Doc. No. 43-D at ¶ 35. The City did not conduct an independent investigation of the assault because of the ongoing State police investigation. Def. Ex. No. 2 at 35. Furthermore, Lopez has set forth no facts establishing the City's lack of an independent investigation "cause[d] [him] to undergo harassment or ma[de] [him] liable or vulnerable to it." see Davis, 526 U.S. at 645; see generally Doc. No. 43. It is undisputed that the District Attorney and the State Police investigated the assault, and that the upperclassmen involved were charged with criminal violations, suspended from Somerville High School, and had no further contact with Lopez. Supra at 7. Under the circumstances, the City's failure to conduct its own independent investigation, concurrent with the State Police investigation, is not sufficient to establish deliberate indifference; in any event, Lopez has set forth no facts establishing that he was harmed as a result of the City's failure.

Second, as to the City's response to the assault of Lopez, it is undisputed that numerous persons with actual authority to address the assault, including Coach Scarpelli, the Head Master and Athletic Director of Somerville High School, and the Superintendent of Somerville School District had notice of the assault and took immediate action to address it. See supra at 5-6. The day that the assault was reported to City personnel, Somerville's athletic director telephoned the accused upperclassmen and informed them that they were no longer permitted on Somerville High School property. Doc. No. 43-D at ¶ 88. The City enlisted mental health care workers to assist students and families cope with trauma associated with the assault. Id. at ¶ 90. The City offered rape crisis counseling sessions and held a general assembly to encourage "students to speak up, and to stand up to harassment, violence, and bullying." Id. at ¶ 94; Def. Ex. No. 2 at

---

fails to implement the Department's guidance if the failure constitutes "a pattern of deliberate indifference").

13

68. Lopez testified that the coaches helped him after the assault and that Coach Scarpelli spoke to him personally, promising to help if "[Lopez] ever need[ed] anything" or "ever need[ed] to talk." Def. Ex. No. 1 at 76.

However, the sexual harassment of Lopez was not limited to the assault at the camp in August of 2013. The name-calling and taunting of Lopez continued for the four years that he was a student at Somerville High School, including one incident at an away game where "the people in the stands" were "taunting [Lopez] with broomsticks." See supra; Pl. Ex. Nos. 3 at 53; 17 at 90. Under Title IX, an institution may be found liable for a hostile environment if a person with authority to address the alleged harassment had actual notice of the harassment "and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." Porto v. Town of Tewksbury, 488 F.3d 67, 74 (1st Cir. 2007) (emphasis added). The parties do not dispute that the athletic director of Somerville High School had actual knowledge of the continued harassment of Lopez. See Pl. Ex. No. 3 at 53. She testified that she "certainly heard [about] it from George [Scarpelli] and other staff," that the taunting of Marvin Lopez "happened for the four years that . . . Marvin [was] on the [soccer] team," and that "people were ruthless in some cases." Id. She had actual authority to address the alleged harassment; Somerville does not argue otherwise. See generally Doc. Nos. 35; 47.

Under the circumstances, a reasonable juror might infer deliberate indifference because of the athletic director's failure to take additional reasonable measures after learning that her initial remedies were ineffective. In response to the continued taunting of Lopez, she contacted the athletic directors of opposing soccer teams and the MIAA to request they provide additional staff at play-off and away games, but she never inquired as to whether Somerville High School could bring additional staff to these games. See Pl. Ex. No. 3 at 56-57. The harassment of Lopez

14

continued, as she acknowledged, after she made these requests, supra, yet she never formally reported the harassment to Somerville's Headmaster or Superintendent;[10] nor did she have a conversation with Martin about his experience or ask him what would help him. Id.[11] These facts, construed in the light most favorable to the Plaintiff, may support an inference of deliberate indifference—that is a response "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. Furthermore, the First Circuit has noted "[t]he highly fact-specific nature of a hostile environment claim tends to make it difficult to draw meaningful contrasts between one case and another for purposes of distinguishing between sufficiently and insufficiently abusive behavior" Billings v. Town of Grafton, 515 F.3d 39, 49 (1st Cir. 2008). Under the circumstances, a reasonable juror might infer that the harassment of Lopez, which was frequent, enduring, and acted as a constant reminder to Lopez of his assault,[12] was sufficiently severe to interfere with his education. Id. at 50 ("The hostile environment question is commonly one of degree—both as to severity and pervasiveness—to be resolved by the trier of fact on the basis of inferences drawn from a broad array of circumstantial and often conflicting evidence.").

---

[10] The Athletic Director testified that she did not make a formal report because "there was nothing to investigate" since the athletic staff could not identify "exactly who" was taunting Lopez from the crowds at the games. She said, "You hear it, but you don't see it." Pl. Ex. No. 3 at 57.

[11] The Athletic Director testified that she did not offer any emotional support to Lopez because she did not want to "mak[e] him feel uncomfortable." Pl. Ex. No. 3 at 63.

[12] Lopez testified in his deposition that memories of his assault would come back to him when he was bullied. See, e.g., Pl. Ex. No. 1 at 91-92 ("I remember I was in class and these kids . . . walked by and they said, Oh, broom boy . . . And as they yelled that, I—it comes back to me, and when I was – taking down notes and I – I felt a tear coming down, but I didn't want to because some of the freshmen that were there never heard about it . . . So they walk by and it kept on my mind, but I tried to erase it . . . that's just hard knowing that you want to cry but you don't want to get bullied more.")

Accordingly, summary judgment as to Lopez's Title IX claim against the City (Count I) is DENIED.[13]

IV. NEGLIGENCE CLAIM

In Count V, Lopez alleges that the City of Somerville, by its negligence caused Lopez's injuries. Doc. No. 18 at ¶¶ 105-12.

Massachusetts General Laws chapter 258 ("Chapter 258") provides, "Public employers shall be liable for injury . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment[.]" Mass. Gen. Laws ch. 258, § 2. "Although the act statutorily eliminates the immunity that governmental bodies would ordinarily enjoy under common law, it sets forth several exceptions to that general waiver of sovereign immunity." Cormier v. City of Lynn, N.E.3d 662, 665 (2018). One such exception is Section 10 (j)'s third party exception, which precludes "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." Mass. Gen. Laws ch. 258 § 10(j). "To have 'originally caused' a condition or situation for the purposes of § 10(j), the public employer must have taken an affirmative action; a failure to act will not suffice." Cormier, 91 N.E.3d at 666. Furthermore, the public employer's affirmative action "must have materially contributed to creating the specific 'condition or situation' that resulted in the harm." Id. at 667 (quoting Kent v. Commonwealth, 771 N.E.2d 770, 776 (2002); see Kent, 771 N.E.2d 770 (2002)

---

[13] In their brief, the Defendants argue that Lopez's Title IX claim against the City of Somerville (Count I) fails because Lopez named the City rather than the School Committee as the Defendant. See Doc. No. 36 at 7. At the hearing on Defendants' Motion, the parties agreed that the School Committee is the proper defendant in this case, that the Lopezes would file an amended complaint adding the School Committee, and that the matter can proceed.

16

(dismissing Chapter 258 claim against the parole board for its negligence in releasing a convicted murderer who, eight years later, shot a police officer).

Lopez has presented no facts to support an inference that the City or its representatives caused, by way of an affirmative act, his injuries. Lopez cites the City's decisions "to sponsor an off-campus athletic camp" and "to schedule an off-site scrimmage" as "affirmative actions" that are the "original cause" of Lopez's injury. See Doc. No. 42 at 16-17. These types of decisions are the sort that Massachusetts courts have found are "omissions" to prevent harm rather than "affirmative actions." See Cormier, 91 N.E.3d at 668 (2018) (no liability for school's policy of having students line up in a particular order in morning without supervision because Section 10 (j) precludes liability predicated on "an act that fails to prevent or diminish harm by failing to keep [plaintiff] and his bullies apart"); Id. (finding claim that school is "liable for not acting in a manner that ensured [student's] safety is "precluded under [Section 10 (j)]"); Brum v. Town of Dartmouth, 428 Mass. 684, 696, 704 N.E.2d 1147, 1155 (1999) ("To include [liability for] conditions that are, in effect, failures to prevent harm, would undermine th[e] principal purpose of [Section 10 (j)]."). For this reason, the Court ALLOWS the motion for summary judgment as to Count V.

V.  Loss of Consortium

In Counts VI and VII, the Lopezes allege that, as a direct and proximate result of the negligence of the City, Cecilia Lopez and Marvin Lopez, Sr., lost the consortium of their son. Doc. No. 18 at ¶¶ 113-18. These claims are derivative of the Chapter 258 negligence claim; a prerequisite for liability for loss of consortium is that the injured party, i.e. Lopez, has a valid tort claim. Sena v. Com., 417 Mass. 250, 264, 629 N.E.2d 986, 994 (1994). Accordingly, given the

17

Court's resolution of the Defendants' Motion with respect to Count V, the Court ALLOWS Somerville's motion for summary judgment as to Counts VI and VII.

VI. CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Doc. No. 35) is DENIED as to Count I and ALLOWED as to all other remaining counts (Counts II-XI).

The Court shall hold a status conference on **July 10 at 2:00 PM**. The remaining parties SHALL be prepared to discuss: a) trial duration, b) trial scheduling, c) whether the parties consent to the exercise of jurisdiction of the magistrate judge (the parties shall not report individual positions and no adverse consequence will result from declining to consent), and d) whether the parties wish to engage in mediation with the Court's mediation program prior to trial.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge